NELSON v AMERICAN STERILIZER COMPANY (ON REMAND)

Docket No. 199685. Submitted December 9, 1996, at Lansing. Decided May 16, 1997, at 9:05 A.M.

Pearline Nelson brought an action in the Wayne Circuit Court against American Sterilizer Company and others, alleging that her exposure to ethylene oxide (EtO) that leaked from a sterilizer caused her to suffer neurological disorders and reduced liver function resulting from liver disease and disorder. The court, William A. Giovan, J., dismissed the action before trial, ruling that the testimony of the plaintiff's experts regarding EtO as the cause of the plaintiff's steatohepatitis was inadmissible because it lacked scientific grounding. The Court of Appeals, NEFF, P.J., and GRIBBS and R. D. GOTHAM, JJ., affirmed in part, reversed in part, and remanded, finding that the trial court had erroneously both excluded the expert testimony and dismissed the action. 212 Mich App 589 (1995). The Supreme Court, in lieu of granting leave to appeal, vacated the judgment of the Court of Appeals in part and remanded the case to the Court of Appeals to reconsider the earlier determination of error in light of MRE 702, with specific attention devoted to the defendants' argument concerning the appropriateness of the plaintiff's expert witnesses' reliance on animal studies in preference to existing epidemiological studies. 453 Mich 943 (1996).

On remand, the Court of Appeals *held*:

1. The trial court correctly barred the plaintiff's experts from testifying concerning the issue of causation with regard to the plaintiff's liver disease. Where, as here, no epidemiological study has found a statistically significant link between EtO exposure and steatohepatitis in humans and animal studies are inconclusive at best, the expert testimony fails to exhibit the level of reliability required by MRE 702.

2. MRE 702 requires a trial court to determine the evidentiary reliability or trustworthiness of the facts and data underlying an expert's testimony before that testimony may be admitted. To determine whether the requisite standard of reliability has been met, the court must determine whether the proposed testimony is derived from recognized scientific knowledge. To be derived from recognized scientific knowledge, the proposed testimony must con-

tain inferences or assertions, the source of which rests in an application of scientific methods. Additionally, the inferences or assertions must be supported by appropriate objective and independent validation based on what is known, e.g., scientific and medical literature. However, the subject of the testimony need not be known to a certainty. As long as the basic methodology and principles employed by an expert to reach a conclusion are sound and create a trustworthy foundation for the conclusion, the expert testimony is admissible no matter how novel.

3. None of the scientific data upon which the plaintiff's experts rely furnishes a scientifically valid basis for the conclusion that they would draw. The analytical gap between the results of the animal studies relied upon by the plaintiff's experts and the inferences drawn therefrom regarding the ultimate issue of human liver disease is too wide to permit a conclusion that these inferences are derived from recognized scientific knowledge.

4. The plaintiff failed to demonstrate that her experts' opinion testimony was derived from recognized scientific knowledge as required by MRE 702. The trial court properly barred the plaintiff's experts from providing causation testimony concerning the plaintiff's liver disease.

5. The trial court also properly dismissed the action regarding the plaintiff's liver disorder because, once the plaintiff's experts were barred from testifying regarding the cause of the plaintiff's steatohepatitis, the plaintiff could not establish a prima facie case regarding her steatohepatitis.

6. The trial court erred to the extent that it dismissed the plaintiff's action in its entirety. To the extent that the plaintiff claims that she suffers from other conditions that are known to be caused in humans by exposure to EtO, she should have been allowed the opportunity to establish whether her experts can testify that these conditions were caused by her EtO exposure and not secondarily to her steatohepatitis. If the plaintiff can provide expert testimony that these other conditions were caused by EtO exposure, she must be allowed to pursue her remaining claims.

Affirmed in part, reversed in part, and remanded.

EVIDENCE — EXPERT TESTIMONY — RECOGNIZED SCIENTIFIC KNOWLEDGE

MRE 702 requires a trial court to determine the evidentiary reliability or trustworthiness of the facts and data underlying an expert's testimony before that testimony may be admitted; the court must determine whether the proposed testimony is derived from recognized scientific knowledge to determine whether the requisite standard of reliability has been met; to be derived from recognized scientific knowledge, the proposed testimony must contain inferences

> or assertions, the source of which rests in an application of scientific methods; the inferences and assertions must be supported by appropriate objective and independent validation based on what is known, but the subject of scientific testimony need not be known to a certainty; expert testimony is admissible no matter how novel where the basic methodology and principles employed by the expert to reach a conclusion are sound and create a trustworthy foundation for the conclusion reached.

*Fred A. Custer* (*Donald M. Fulkerson*, of Counsel), for the plaintiff.

*Reynolds, Beeby & Magnuson, P.C.* (by *Frank K. Mandlebaum* and *Elizabeth A. Fellows*) (*Skadden, Arps, Slate, Meagher & Flom*, by *Bert L. Wolff*, of Counsel), for the defendants.

ON REMAND

Before: NEFF, P.J., and GRIBBS and YOUNG, JJ.

NEFF, P.J. This tort action arises from plaintiff's inhalation exposure to a chemical known as ethylene oxide (EtO), a fumigant used, among other things, for sterilizing heat and moisture sensitive medical equipment. The trial court barred plaintiff's experts from testifying regarding the issue of causation, after ruling that the experts' conclusion that chronic, low-level inhalation exposure to EtO causes steatohepatitis in humans lacked sufficient scientific grounding. The court then dismissed plaintiff's action. In our original opinion, we found, in part, that the trial court had erroneously both excluded the proffered expert testimony and dismissed the action. *Nelson v American Sterilizer Co*, 212 Mich App 589; 538 NW2d 80 (1995). Our Supreme Court, in lieu of granting leave to appeal, vacated our judgment, in part, however, and remanded this case to us so that we might reconsider

our earlier determination of error in light of MRE 702, with specific attention devoted to defendants' argument concerning the appropriateness of plaintiff's expert witnesses' reliance on animal studies in preference to existing epidemiological studies. *Nelson v American Sterilizer Co*, 453 Mich 943 (1996). On remand, we conclude that the trial court correctly barred plaintiff's experts from testifying on the issue of causation with regard to plaintiff's liver disease. Where, as here, no epidemiological study has found a statistically significant link between EtO exposure and steatohepatitis in humans and the results of animal studies are inconclusive at best, the expert testimony fails to exhibit the level of reliability required by MRE 702. We now affirm in part, reverse in part, and remand.

I

Plaintiff produced two causation experts, both of whom were her treating physicians, whose testimony may be summarized as follows. First, no existing epidemiological studies report an association between inhalation exposure to EtO and the incidence of liver disease in humans. Second, existing animal studies demonstrate that certain known concentrations of EtO introduced into the body through inhalation over certain known periods targets the livers of test animals and induces hepatotoxicity in those animals. Third, plaintiff was exposed to unknown concentrations of EtO for unknown durations. Fourth, plaintiff's clinical findings were consistent with the liver abnormalities found in rodents exposed to EtO through inhalation. Fifth, because EtO reaches the livers of rodents and causes hepatotoxicity in rodents, it

likewise reaches the livers of humans and causes hepatotoxicity. Sixth, plaintiff's exposure to unknown concentrations of EtO for unknown durations resulted in plaintiff's liver disease. Both experts employed a differential diagnosis technique to reach a diagnostic conclusion by exclusion of all other known causes of plaintiff's steatohepatitis.

II .

The question whether chronic inhalation exposure to EtO causes steatohepatitis in humans is scientific in nature, and it is to the scientific community that the law must look for the answer. For this reason, expert witnesses are indispensable in this case. But that is not to say that the trial court's hands were inexorably tied, or that it must have accepted uncritically any sort of opinion espoused by either party's proffered experts merely because their credentials rendered them qualified to testify. To the contrary, under the rules of evidence, the trial court was charged with ensuring that any and all scientific testimony to be admitted was not only relevant, but also reliable. *Amorello v Monsanto Corp*, 186 Mich App 324, 331-332; 463 NW2d 487 (1990). See *Kelley v Murray*, 176 Mich App 74, 79; 438 NW2d 882 (1989).

The primary source of this obligation is MRE 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. The degree of discretion this evidentiary rule affords a trial court is at the heart of the resolution of the question now before this Court.

A

MRE 702 provides, in pertinent part, that if *"recognized scientific . . . knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue," then an expert "may testify *thereto.*" (Emphasis added.) Accordingly, MRE 702 restricts the subject of an expert's testimony to "recognized scientific . . . knowledge." There are no Michigan appellate cases that expressly construe the phrase "recognized scientific knowledge." Some guidance may be taken, however, from *Amorello, supra.*

In *Amorello, supra* at 332, this Court opined that the facts and data upon which an expert relies in formulating an opinion must be reliable. The Court then concluded that the plaintiffs had failed to demonstrate the admissibility of the opinion testimony of their expert to the effect that PCB exposure caused the plaintiffs' health problems because the plaintiffs' had failed to offer evidence to rebut the defendants' claims that the testimony did not have a reasonable medical or reliable scientific basis and was unsupported by scientific and medical literature. *Amorello, supra* at 331-332.

We also take guidance from an application of the rules of construction to the phrase "recognized scientific knowledge." The interpretation of a court rule is subject to the same principles that govern statutory construction. *Michigan Basic Property Ins Ass'n v Hackert Furniture Distributing Co, Inc,* 194 Mich App 230, 234; 486 NW2d 68 (1992). All words and phrases are to be construed and understood according to the common and approved usage of the language. *In re Public Service Comm's Determination, No 2,* 204 Mich App 350, 353; 514 NW2d 775 (1994).

Reference to a dictionary is appropriate to ascertain the ordinary meaning of a word. *Popma v Auto Club Ins Ass'n*, 446 Mich 460, 470; 521 NW2d 831 (1994).

The word "recognized" connotes a general acknowledgment of the existence, validity, authority, or genuineness of a fact, claim, or concept. Black's Law Dictionary (6th ed), p 1271; *Webster's New World Dictionary, Third College Edition*, p 1121. The adjective "scientific" connotes a grounding in the principles, procedures, and methods of science. *Id.*, p 1202; *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 590; 113 S Ct 2786; 125 L Ed 2d 469 (1993). Finally, the word "knowledge" connotes more than subjective belief or unsupported speculation. *Id.* at 590. The word " 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.' " *Id.*, quoting *Webster's Third New International Dictionary*, p 1252 (1986).

We conclude that MRE 702 requires a trial court to determine the evidentiary reliability or trustworthiness of the facts and data underlying an expert's testimony before that testimony may be admitted. To determine whether the requisite standard of reliability has been met, the court must determine whether the proposed testimony is derived from "recognized scientific knowledge." To be derived from recognized scientific knowledge, the proposed testimony must contain inferences or assertions, the source of which rests in an application of scientific methods. Additionally, the inferences or assertions must be supported by appropriate objective and independent validation based on what is known, e.g., scientific and medical literature. This is not to say, however, that the subject

of the scientific testimony must be known to a certainty, *Daubert, supra* at 590. As long as the basic methodology and principles employed by an expert to reach a conclusion are sound and create a trustworthy foundation for the conclusion reached, the expert testimony is admissible no matter how novel. *Id.* at 596; see *Richardson v Richardson-Merrell, Inc,* 273 US App DC 32, 41; 857 F2d 823 (1988).

B

Having set forth the legal principles that will guide our resolution of the question before us, we now turn to a discussion of the evidentiary reliability of the causation testimony of plaintiff's experts. We begin with a brief review of the scientific methodology employed in the study of disease causation to illustrate the nature of the evidence we must examine and apply to this case, and to address defendants' contention that the studies relied upon by plaintiff provide an insufficient basis for her experts' opinions.

1

Scientific studies concerning disease causation come in several forms, two of which are cohort epidemiological studies and in vivo animal studies. Defendants' experts rely on human epidemiological studies, and to a lesser degree on in vivo animal studies, to support their conclusion that plaintiff's exposure to EtO was not the cause of her liver disease. Plaintiff's experts rely solely on in vivo animal studies to support their causation opinions.

Epidemiology is the study of the distribution of disease in populations and the risk factors associated with particular diseases. *Wade-Greaux v Whitehall*

*Laboratories, Inc*, 874 F Supp 1441, 1451 (D Virgin Islands, 1994), aff'd 46 F3d 1120 (CA 3, 1994); *Smith v Ortho Pharmaceutical Corp*, 770 F Supp 1561, 1573 (ND Ga, 1991); *Lynch v Merrell-Nat'l Laboratories Division of Richardson-Merrell, Inc*, 646 F Supp 856, 863 (D Mass, 1986), aff'd 830 F2d 1190 (CA 1, 1987). It is observational, rather than experimental, research, in that epidemiologists observe the differences between those who have had a particular exposure and those who have not. *Wade-Greaux*, 874 F Supp 1451; *Smith, supra* at 1573; *Lynch*, 646 F Supp 863. In a cohort study, epidemiologists follow persons with a particular exposure in comparison to other persons not so exposed and look prospectively to determine the outcome. *Wade-Greaux*, 874 F Supp 1451. In vivo animal studies are those conducted on living animals. *Id.* at 1453.

Epidemiologists use an analytic tool known as the "null hypothesis," which postulates that there is no association between a specific exposure and a particular outcome. *Id.* at 1451-1452. The goal of an epidemiological study is to determine whether one can reject the null hypothesis and conclude that, in fact, there is an association between the exposure and the outcome. *Id. at* 1451-1452; *Smith, supra* at 1574. A "positive" epidemiological study is one that presents a statistically significant association between a particular exposure and an increased risk of experiencing a particular outcome. *Wade-Greaux*, 874 F Supp 1452.

2

There is no Michigan appellate case that addresses whether medical causation testimony premised solely on the reported findings of in vivo animal studies pos-

sesses sufficient evidentiary reliability to warrant its admission under MRE 702. The federal courts have addressed this question, however, in the context of FRE 702 and 703. As a general rule, the federal courts have found expert opinion testimony concerning the medical causation of disease to be admissible where the testimony is supported by statistically valid epidemiological studies. *Allen v Pennsylvania Engineering Corp*, 102 F3d 194, 197 (CA 5, 1996); *Wade-Greaux*, 874 F Supp 1483; *Lynch*, 646 F Supp 863-864. Additionally, because appropriately conducted animal studies can be helpful in determining human outcomes, *Turpin v Merrell Dow Pharmaceuticals, Inc*, 959 F2d 1349, 1360 (CA 6, 1992), some federal courts have determined that expert opinion testimony is admissible if supported only by animal studies. *In re Paoli Railroad Yard PCB Litigation*, 35 F3d 717, 781 (CA 3, 1994); see *Bell v Swift Adhesives, Inc*, 804 F Supp 1577, 1579 (SD Ga, 1992). Other federal courts tend to view animal studies with suspicion, however, and therefore exclude expert opinion testimony based on animal studies in the absence of confirmatory epidemiological data or in the face of an overwhelming body of contrary epidemiological evidence. *Raynor v Merrell Pharmaceuticals, Inc*, ___ US App DC ___, ___; 104 F3d 1371, 1374 (1997); *In re Paoli, supra* at 780-781; *Wade-Greaux*, 874 F Supp 1483; *Bell, supra* at 1579. This suspicion arises because it is scientifically invalid to extrapolate observations in animal experiments directly to human beings to determine human outcomes, *Raynor*, ___ US App DC ___; 104 F3d 1375; *Allen, supra* at 197; *Wade-Greaux*, 874 F Supp 1484; *Lynch*, 646 F Supp 865, in part, in light of the recognized biological fact

that some agents may cause disease occurrence in one species and not in another, *Allen, supra* at 197; *Wade-Greaux*, 874 F Supp 1454; *Viterbo v Dow Chemical Co*, 826 F2d 420, 424 (CA 5, 1987).

We need not determine whether medical causation testimony premised solely on the reported findings of in vivo animal studies has sufficient evidentiary reliability to permit its admission under MRE 702 because, on examination, none of the scientific data upon which plaintiff's experts, rely furnishes a scientifically valid basis for the conclusion they would draw. In fact, the reliability of plaintiff's expert testimony is undercut by the epidemiological studies relied upon by defendants, by the inconclusive nature of the animal studies relied upon by plaintiff's experts, and by a complete absence of any animal studies reporting liver injury from chronic low-dose inhalation exposure to EtO.

3

The parties agree that at the time of trial no cohort epidemiological studies existed that reported a statistically significant association between EtO exposure and steatohepatitis, or other liver disease, in humans. We have reviewed the cohort epidemiological studies relied upon by defendants. Those studies that specifically examined whether EtO inhalation exposure results in injury to or disease in the human liver suggest a confirmation, and not a rebuttal, of the null hypothesis that EtO inhalation exposure is not associated with diseases of the human liver.

Additionally, the analytical gap between the results of the animal studies relied upon by plaintiff's experts and the inferences drawn therefrom regarding the

ultimate issue of human liver disease is too wide to permit a conclusion that these inferences are derived from recognized scientific knowledge. The reported findings of the animal studies used by the parties, summarized, are these: (1) acute exposure to high concentrations of EtO, either administered orally or inhaled, cause unspecified "slight liver damage" or "slight" liver injury characterized as light coloration and slight fatty degeneration in mice, rats, and guinea pigs; (2) liver regeneration is evident in rats removed from EtO exposure; (3) EtO introduced into the body through inhalation concentrates in the liver, among other organs; (4) a "slight" increase in liver weight is evident in female rats exposed to EtO in a concentration of 204 parts per million (ppm) 122 to 157 times over 176 to 226 days; (5) a statistically significant increase in the liver weight of female mice is evident when the mice are exposed to EtO in a concentration of 250 ppm, but histologic examination of the livers of these mice revealed normal findings; (6) no adverse effects were observed in guinea pigs, rabbits, and monkeys exposed to EtO in a concentration of 113 ppm seven hours a day, five days a week for six or seven months; (7) no adverse effects were observed in rats and mice exposed to EtO in a concentration of 49 ppm for seven hours a day, five days a week for six or seven months; and (8) the glutathione levels in rat livers were affected when rats were exposed to EtO in a concentration of 500 ppm for six hours, three times a week for thirteen weeks, but glutathione levels in rabbit livers were unaffected when rabbits were exposed to EtO in concentrations of 10, 50, or 250 ppm for six hours a day, five days a week for twelve weeks.

These findings demonstrate, when viewed together, that different species react differently to exposure to EtO, with some species evidencing adverse effects at lower exposure levels than other species. The lack of capacity for the mouse and rat models to predict how even the guinea pig, rabbit, and monkey models would respond to EtO exposure necessarily undercuts confidence that the mouse and rat models will predict accurately how humans will respond to EtO exposure.

Moreover, the results appear to indicate that slight liver injury results from acute,[1] subacute,[2] subchronic,[3] and chronic[4] exposure to high doses of EtO, at least in some species. None of the results demonstrate or suggest liver injury in any species as the result of chronic exposure to EtO in concentrations of 49 ppm or less.

4

Both of plaintiff's causation experts have opined that plaintiff's steatohepatitis was caused by chronic low-dose exposure to EtO. None of the animal studies relied on by these experts report, however, an association between chronic low-dose exposure to EtO and liver disorders in animals. Additionally, one of plaintiff's experts testified that the pathophysiology of plaintiff's liver disease was consistent with a hypersensitive reaction to EtO. None of the studies relied upon by plaintiff's experts report or address hyper-

---

[1] Acute exposure is defined as exposure for less than twenty-four hours.

[2] Subacute exposure is defined as exposure for one month or less.

[3] Subchronic exposure is defined as exposure for between one and three months.

[4] Chronic exposure is defined as exposure for more than three months.

sensitive reactions in animals. Neither plaintiff nor her experts provide any understandable scientific basis for establishing the value of directly extrapolating human conclusions from the findings of the animal studies upon which they rely. Accordingly, in the absence of any evidence that chronic low-dose exposure or hypersensitivity to EtO caused liver disease or injury in animals, and in the absence of histologic findings of liver injury or disease in animals exposed to EtO of a similar or identical nature to the disease exhibited by plaintiff, the deductions of plaintiff's experts that chronic low-dose exposure or hypersensitivity to EtO causes liver disorders of any kind in humans do not rest in an application of scientific methods. Nor are these deductions supported by scientific or medical literature. Accordingly, plaintiff has failed to demonstrate that her experts' opinion testimony was derived from recognized scientific knowledge as required by MRE 702. The trial court did not err in granting defendants' motion in limine and barring plaintiff's experts from providing causation testimony concerning plaintiff's liver disease. *Mulholland v DEC Int'l Corp*, 432 Mich 395, 402; 443 NW2d 340 (1989).

We also conclude that the trial court did not err in dismissing plaintiff's action with regard to her liver disorder. The trial court limited plaintiff to two causation experts, those being her treating physicians. The court then correctly barred these two experts from testifying regarding the causation of plaintiff's steatohepatitis. This ruling left plaintiff with no evidence of causation. Without such evidence, plaintiff could not establish a prima facie case with regard to her steatohepatitis. Under these circumstances, the

trial court correctly dismissed plaintiff's actions with regard to her steatohepatitis.

5

We conclude, however, that the trial court acted prematurely in dismissing plaintiff's action in its entirety. The medical and scientific literature relied upon by the parties does recognize that inhalation exposure to EtO can cause peripheral neuropathy, headaches, weakness, weight loss, nausea, and vertigo in humans. Plaintiff claims to suffer from each of these conditions. The proceedings below focused solely on the causation of plaintiff's liver disease and anemia.[5] To the extent that plaintiff claims she suffers from other conditions that are known to be caused in humans by exposure to EtO, she should be allowed the opportunity to establish whether her experts can testify that these conditions were caused by her EtO exposure and not secondarily to plaintiff's steatohepatitis. If she can provide expert testimony that these other conditions were caused by EtO exposure, then plaintiff should be allowed to pursue her remaining claims.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

---

[5] One of plaintiff's experts testified that plaintiff's anemia was secondary to her steatohepatitis. Because the trial court correctly barred plaintiff's experts from offering their opinions that EtO caused plaintiff's steatohepatitis, it was proper to preclude opinion testimony that EtO caused her anemia, secondarily to the steatohepatitis.