*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL H. BERNARDI,

      Plaintiff-Appellant,

UNPUBLISHED

v

TONYA MELYNDA ROCK,

      Defendant-Appellee.

No. 347134
Lapeer Circuit Court
LC No. 17-051096-NI

Before: GLEICHER, P.J., and GADOLA and LETICA, JJ.

GLEICHER, P.J. (*dissenting*).

Let's say you were trying to hang a picture and you hit your thumb with the hammer. The blow was somewhat glancing and not terribly hard, but you have arthritis and the thumb throbbed for a few minutes. Ice helped. The next day the pain was excruciating, so you visited your family doctor. He recommended Advil and immobilization. The pain persisted and you saw a specialist. An x-ray revealed a fracture. The specialist told you the hammer blow likely did it. He explained that the "temporal connection" between the hammer blow and your pain was a compelling fact.

Would a reasonable person agree that you probably broke your thumb with the hammer? Would a reasonable person find the specialist's opinion that the hammer blow caused the fracture "speculative?" Would a reasonable person be "guessing" by concluding that the hammer trauma broke the bone? Maybe your arthritis made your thumb more susceptible to breaking. Maybe a previous injury to the thumb weakened the surrounding ligaments. But the specialist's opinion hardly qualifies as unreliable, hypothetical, or built on thin air.

This case is about an equally clear-cut cause-and-effect relationship. Unfortunately, the majority has tied itself up in legal knots trying to avoid the obvious—that a specialist's causation opinion predicated in part on a patient's report of recent trauma is sufficiently buttressed by "facts" and is the product of reliable principles and methods. Because the majority has misapplied the legal standards governing expert testimony, I respectfully dissent.

# I

Plaintiff Michael Bernardi drove a school bus for the Lapeer Community Schools. Late one afternoon he stopped the bus to drop off a student, shifting into neutral. Bernardi had one foot on the brake pedal and reached with his right arm to pull the "park brake" into place before opening the bus door. While looking down at her lap, defendant Tonya Rock hit the back of the school bus with her Jeep Laredo. She estimated that she was traveling 20 miles per hour when she saw the bus and applied her brakes. On impact, Bernardi's foot came off the brake pedal and the bus rolled "ten feet or so." The Jeep sustained about $3,500 in damage.

Bernardi denied any injury at the scene. The next morning, however, he felt "terrible" and could not get out of bed. Pain radiated down the back of his leg and into one buttock. He saw a physician who prescribed rest and pain medication. Bernardi never had back pain before. During his 60-plus years of life, he had never consulted a doctor for a back problem or received any back-pain treatment, despite having spent 35 of those years in an auto plant working as a hi-lo driver. This evidence is unrefuted.

Over the next six weeks, conservative medical therapy did not alleviate Bernardi's unrelenting back pain, which at times radiated into his foot. His family doctor referred him to Dr. Geoffrey Seidel, a board-certified specialist in Physical Medicine and Rehabilitation. Dr. Seidel obtained a history from Bernardi, and learned that the back pain began less than 24 hours after an accident in which the bus Bernardi was driving was struck from behind. On examination, Dr. Seidel noted that Bernardi had "an antalgic gait, a positive Trendelenburg on the right." Dr. Seidel explained that this meant that Bernardi exhibited a right-sided limp and that pain or weakness caused the gait alteration. Dr. Seidel further noted "hypersensitivity in the L5 nerve root distribution." Dr. Seidel's "impression[]" was that Bernardi had sustained a "work-related bus driving accident" and had "low back pain" and "right lumbar radicular symptoms."

Dr. Seidel ordered a CT scan of Bernardi's spine that revealed evidence of chronic spinal stenosis as well as a disc herniation. At the L4-L5 level, the radiologist identified a "[l]arge central/left paracentral disc extrusion with superior migration of disc material resulting in moderate-to-severe central canal stenosis and mass effect upon the cauda equina." The radiologist's impression was "[l]arge disc extrusion at L4-L5 with superior migration of disc material in impingement of the cauda equina."

In other words, Bernardi had long-standing degenerative disease of his back, as well as a ruptured disk, and the disk material was close to an important nerve bundle. This case is about the etiology of the ruptured disk. Dr. Seidel testified that the "very large disc protrusion" seen on the scan was "not something I typically see in lumbar spinal stenosis cases, and there was trauma related to that." The defense contends that the timing of Bernardi's pain was a mere coincidence, the cause of the herniation was his underlying spinal stenosis, and that the accident the day before the symptoms began had nothing to do with it.

Dr. Seidel treated Bernardi's back pain conservatively. When it did not improve, Dr. Seidel referred Bernardi to a surgeon. Dr. Seidel's referral letter noted: "I consider this disc herniation to be work related."

After reviewing Bernardi's CT scan, the surgeon confirmed the presence of a herniated disc. He performed a laminectomy and removed the disk fragments. Despite the surgery and physical therapy, Bernardi did not obtain much relief. He consulted other physicians who agreed that he was disabled due to his back pain and associated neurological symptoms. Additional back surgery was recommended. Bernardi then filed this third-party no-fault action against Rock. He underwent spinal fusion surgery while this case was pending.

II

The circuit court granted summary disposition to Rock, ruling that Dr. Seidel's testimony linking the accident and Bernardi's herniated disk was inadmissible because it was "unreliable" under MRE 702. The majority affirms, holding that the trial court did not abuse its discretion because Dr. Seidel's testimony was "unsupported by peer-reviewed medical literature," a "temporal connection alone is insufficient to establish causation," and Dr. Seidel erroneously assumed that Bernardi had not been wearing a seat belt at the time of the accident. The circuit court "appropriately" relied on these facts, the majority holds, to exclude Dr. Seidel's testimony.

The majority and the circuit court have misapplied MRE 702, and in so doing the circuit court abused its discretion. Dr. Seidel is an exceptionally well qualified specialist in spinal disease. His expert opinion rested on a solid factual foundation consisting of Bernardi's medical history, his physical examination, and the results of several objective radiologic and electrophysiological tests. Dr. Seidel employed differential diagnosis analysis in reaching his causation opinion, a methodology universally used by physicians to determine the etiology of a patient's disease. "In the medical context, differential diagnosis is a common method of analysis, and federal courts have regularly found it reliable under *Daubert*."[1] *Bitler v AO Smith Corp*, 400 F3d 1227, 1237 (CA 10, 2004). The reasons offered by the circuit court for excluding Dr. Seidel's testimony (and affirmed by the majority) are either irrelevant to the inquiry or go to the weight of his testimony, not its admissibility.

"MRE 702 incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert*[.]" *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). A circuit court's gatekeeping function focuses on an examination of the expert's *methodology* and the principles animating it. *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 595; 113 S Ct 2786; 125 L Ed 2d 469 (1993). The reliability standard "entails a preliminary assessment of whether the reasoning or methodology is scientifically valid." *Id*. 592-593. Reliability depends "solely on principles and methodology, not on the conclusions that they generate." *Id*. at 595.

MRE 702 focuses on four aspects of an expert's proposed testimony: (1) whether the expert is qualified to testify "by knowledge, skill, experience, training, or education," (2) whether the proposed testimony "is based on sufficient facts or data;" (3) whether "the testimony is the product of reliable principles and methods," and (4) whether "the witness has applied the principles and methods reliably to the facts of the case." Dr. Seidel's testimony fulfills these requirements. The circuit court's decision to the contrary, echoed by the majority, confuses the task of assessing *reliability* with the job of the jury—weighing the evidence and deciding which side should prevail.

---

[1] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

Whether the expert is persuasive is not a legal question. Nor does the existence of evidence that might challenge the soundness of the expert's ultimate conclusion render the opinion legally inadmissible.

Dr. Seidel's expert qualifications are rock solid. He is board certified in Physical Medicine and Rehabilitation and achieved an additional board certification from the American Academy of Neuromuscular and Electrodiagnostic Medicine. He has practiced in these fields for more than a quarter century, and serves as a clinical professor in the medical schools of both Michigan State and Wayne State Universities. Dr. Seidel is the medical director of the spine clinic at Henry Ford Macomb Hospital. His regular practice includes patients with brain and spinal injuries, stroke, and musculoskeletal problems. He also reads the radiologic studies he orders and performs and interprets his own electrodiagnostic studies. Dr. Seidel is fully qualified to give an expert opinion in this case. The defense has not offered a physician witness in opposition to Dr. Seidel.

Dr. Seidel testified that he formed his opinion that trauma—the bus accident—caused Bernardi's disk herniation based on Bernardi's history, his physical examination, and the objective studies he reviewed (a CT scan and an EMG). Bernardi reported that he never experienced back pain before being involved in the accident underlying this case. He did not report any other trauma that might have caused the rupture.[2] Within 24 hours of the bus accident, he experienced debilitating back pain. He saw a physician and reported the pain within that same time frame. When Dr. Seidel examined Bernardi he considered several possible diagnoses, but suspected a disc herniation, as the symptoms had been triggered by trauma and Bernardi exhibited objective signs of that condition: he limped and had a positive Trendelenburg sign. Dr. Seidel investigated this potential diagnosis by personally performing an EMG. He also reviewed the images of Bernardi's CT scan. This data confirmed "there was an anatomical abnormality that was correlating [with] the symptoms that were down his leg." Dr. Seidel testified:

> Based upon the timing, I consider the anatomical findings on the CT scan image to correlate with the timing of onset of symptoms. And I have the benefit of physical exam findings, electrodiagnostic exam findings that I interpreted all in real time to say, in my view, this is all related to that incident.

The "facts or data" considered by Dr. Seidel were unquestionably sufficient under MRE 702 to form a medical opinion regarding the causation of disease, fulfilling the second aspect of MRE 702. The same type of facts or data are routinely relied upon by physicians; the defense has not suggested that any *relevant* facts were missing.

Based on Bernardi's history, physical examination, and his review of the studies, Dr. Seidel concluded that Bernardi's pain was caused by the ruptured disk, which in turn was caused by trauma. Contrary to the majority's view, there was nothing "speculative" or "unreliable" about this methodology. Dr. Bernardi engaged in the differential diagnosis method. This method

---

[2] As discussed below, the record contains no evidence that the minor accident predating the bus accident, mentioned by the majority and cited by the circuit court, caused any injury or damage to Bernardi or anyone else. Bernardi did not experience pain or even consult a physician after that accident. This minor accident is a quintessential red herring, a diversion utterly without relevance.

represents "a *standard* diagnostic tool used by medical professionals to diagnose the most likely cause or causes of illness, injury and disease." *Glaser v Thompson Med Co, Inc*, 32 F3d 969, 978 (CA 6, 1994) (emphasis added). "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v Gislaved Gummi AB*, 178 F3d 257, 262 (CA 4, 1999). "[T]he overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry." *Id*. at 263. See also *People v McKewen*, 326 Mich App 342, 351; 926 NW2d 888 (2018) (characterizing differential diagnosis as "a well-recognized process"); *Alder v Bayer Corp, AGFA Div*, 2002 UT 115; 61 P3d 1068, 1084 (2002) ("[D]ifferential diagnosis is one of the oldest and most widely used and recognized of all the methods. Historically and even presently, in many instances, differential diagnosis has been the only method available."). Because the differential diagnosis method is regularly used by physicians to determine the cause of a patient's disease, Dr. Seidel's testimony is "the product of reliable principles and methods," fulfilling the third prong of MRE 702.

Contrary to the majority's suggestion that Bernardi's "self-reported history" of pain rendered it suspect, Dr. Seidel's reliance on a patient's history is unobjectionable evidentially and legally.

> A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, *the taking of medical histories*, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely. [*Hardyman v Norfolk & Western R Co*, 243 F3d 255, 260-261 (CA 6, 2001) (quotation marks and citation omitted, emphasis added).]

Physicians rely on medical histories as a matter of course. No evidence supports that Bernardi's history was inaccurate. No law supports that Dr. Seidel's reliance on that history was improper or rendered his opinion unreliable.

Dr. Seidel formulated a causation opinion by applying the differential diagnostic method used by doctors who diagnose and treat back pain. The patient's history revealed no pain before the accident, and extreme, debilitating back pain within 24 hours afterward. The physical examination and objective diagnostic studies revealed the presence of a ruptured disk. These facts, taken together, are sufficient to serve as the foundation for a medical opinion. No evidence suggests that Dr. Seidel applied the differential diagnosis method improperly. No evidence suggests that the central premise of Dr. Seidel's opinion—that trauma can rupture an intervertebral disc—is incorrect scientifically. Accordingly, his methodology was inherently reliable. MRE 702 requires nothing more than this showing.

It bears emphasis that ruptured disks are not rare, and that trauma is a well-recognized cause of disk rupture. A cursory review of Michigan caselaw confirms these facts, and reflects that even small forces can cause a disc rupture. See, e.g., *Samhoun v Greenfield Constr Co, Inc*, 163 Mich App 34, 37; 413 NW2d 723 (1987) (twisting to avoid being hit by a piece of steel); *Adas*

*v Ames Color-File*, 160 Mich App 297, 299; 407 NW2d 640 (1987) (disc ruptured while moving a filing unit); *Woods v Sears, Roebuck & Co*, 135 Mich App 500, 505; 353 NW2d 894 (1984) (disc ruptured by a fall at work; symptoms did not emerge until five months after the fall).

So how did we get here? Why is there any dispute at all about the reliability of Dr. Seidel's opinion? While it is true that Bernardi had preexisting spinal stenosis, no one disputes that the degenerative changes in Bernardi's back were, until the accident, entirely asymptomatic. The spinal changes never restricted Bernardi's activities, and he never so much as took an Advil to treat his degenerative spinal disease. The aggravation of a preexisting condition can create a compensable injury under the no-fault act, as the majority concedes. See *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW 2d 469 (2009).

The defense contends that the bus accident was too minor to generate the forces required to rupture a disk. What evidence did the defense present on this score, you might ask? Good question. Rock presented no testimony from a physician disputing Dr. Seidel.[3] None. The defense presented no peer-reviewed literature calling Dr. Seidel's opinion into question. None. Rather, the defense relied on the report of an accident reconstructionist, John Bethea, who concluded that the forces involved in the accident were minimal. He estimated the bus's velocity changed "approximately 2.0 to 3.7 mph" due to the impact, and opined that "[i]mpact tests using human subjects indicate that velocity changes within this range are below levels associated with injuries."

Bethea's qualifications are unknown; they are not described in the report or the record. Bethea's report states that he was not provided with Bernardi's medical records. He averred that his conclusions were "given within a reasonable degree of *engineering* probability and certainty;" obviously, as a nonphysician, Bethea is unqualified to render medical opinions of any sort, much less regarding causation. He cited no literature or other support for his opinion that the velocity change he believed to have been involved in the accident was insufficient to cause Bernardi's ruptured disk.

Bethea's report was not accompanied by an affidavit and therefore should not have been considered by the circuit court. See MCR 2.116(G)(6). But even ignoring that defect, the report is not admissible regarding *medical* causation, as it does not come close to satisfying the requirements of MRE 702. The circuit court's consideration of this report as causation evidence, standing alone, qualifies as an abuse of discretion. As a gatekeeper under MRE 702, the circuit court was charged with screening expert qualifications as well as the reliability of expert opinion, regardless of which side offered it. Bethea, an engineer who never reviewed a single page of Bernardi's medical record, is patently unqualified to testify regarding the causation of Bernardi's ruptured disc. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 788; 685 NW2d 391 (2004) ("In order for Mr. Hnat to provide an admissible opinion interpreting medical records for purposes other than those related to the expertise of social workers, plaintiff bore the burden of showing that Mr. Hnat was qualified by knowledge, skill, experience, training, or education in medicine. Given the absence of such evidence, plaintiff failed to carry the burden of establishing the admissibility

---

[3] Dr. Roth, the defense physician who examined Bernardi, rendered an opinion focused on Bernardi's current condition, not the cause of the herniated disc, and concluding that he had made a full recovery. The omission of a causation opinion speaks volumes.

of Mr. Hnat's medical opinions, regardless of the admissibility of the records that ostensibly informed this opinion."). The circuit court not only considered Bethea's report as medical causation evidence, it *relied* on it to exclude Dr. Seidel's opinion. I cannot conceive of a more obvious *Daubert* error.

Given that the defense presented no admissible evidence calling Dr. Seidel's testimony into question, a *Daubert* analysis was unnecessary and inappropriate. While judges should act as gatekeepers when presented with potentially questionable scientific evidence, there was nothing questionable, novel, or shaky about Dr. Seidel's methodology. His was a medical opinion drawn from a patient's history, physical exam, and imaging studies—routine practice, not "junk science." Dr. Seidel was presented with a reason for the disc rupture—trauma—that all recognize as a potential cause. The defense proposition that the trauma was too slight to cause a herniation might have opened the door to a *Daubert* inquiry had it been accompanied by any admissible medical evidence—but it was not.

In a post-*Daubert* opinion, the United States Supreme Court observed that in ordinary cases, a gatekeeping inquiry may be unnecessary because "the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167; 143 L Ed 2d 238 (1999). This is precisely such a case. The defense offered no scientific basis calling into question the reliability of Dr. Seidel's causation opinion other than that the impact was relatively small, and that Dr. Seidel initially believed (incorrectly) that Bernardi had not been wearing a seat belt.[4] Dr. Seidel was well aware of the circumstances surrounding the impact, including that the bus sustained no damage. Nevertheless, he held steadfast to his opinion, explaining that even a small force, such as a cough or a sneeze, can rupture a disk. No admissible evidence contradicted this. He emphasized that the history of a trauma, combined with the timing of Bernardi's severe symptoms, cemented his view that the two were linked. There is nothing novel, unreliable, unscientific, or improperly speculative about this opinion.

The objective of the requirements encapsulated in MRE 702 "is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 US at 152. The *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. at 150 (quotation marks omitted). "[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id*. at 152. When confronted with a challenge to the admission of expert testimony, the overarching question is not "whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008) (quotation marks and citation omitted).

---

[4] As discussed below, the seat belt issue is another red herring.

Dr. Seidel's opinion was reasonable on its face, and was supported methodologically. That is enough to allow its admission. The additional reasons offered by the circuit court and the majority for rejecting it, discussed below, lack legal merit.

III

The majority asserts that Dr. Seidel's testimony qualified as unreliable under MRE 702 because Dr. Seidel failed to produce any peer-reviewed literature supporting his opinion, and because "a temporal connection alone is insufficient to establish causation[.]" The majority misunderstands the law.

Dr. Seidel testified that he was unaware of any peer-reviewed literature on the question of how much trauma is necessary to rupture a disc. When confronted with Bethea's opinion that a low-velocity accident such as this one could not cause "the damage to Mr. Bernardi's spine that he is alleging in this accident," Dr. Seidel responded:

> Disc herniations are known to occur without trauma. They are known to occur with trauma.
>
> There is no literature describing how much velocity is required to herniate a disc in this situation. *There is no literature that supports that*.
>
> So whether a 2.0 to 3.7 velocity change in an elderly male with underlying arthritic change is more at risk for disc herniation, it appears it is.

Dr. Seidel also clarified:

> Disc herniations are not immediate. You have to create a crack or a fissure in the disc and then, over ensuing days, the disc material works its way out of the crack or the gap.
>
> I don't see anything unusual about this scenario. [Emphasis added.]

The defense offered no literature—peer-reviewed or otherwise—contradicting Dr. Seidel's statement that the medical literature does not address the subject in dispute. The only evidence before the circuit court is that no such peer-reviewed evidence exists. Absent evidence that published literature speaks to the subject, it was an abuse of discretion for the circuit court to have required Dr. Seidel to produce any.

*Daubert* itself contradicts the circuit court's view. "Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability . . . . Some propositions, moreover, are too particular, too new, or of too limited interest to be published." *Daubert*, 509 US at 593 (citations omitted). The United States Supreme Court reemphasized this point in *Kumho*:

> *Daubert* . . . made clear that its list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged. It might not be surprising in a

-8-

particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. [*Kumho*, 526 US at 152.][5]

Our Supreme Court has made the same point. In *Edry v Adelman*, 486 Mich 634, 641; 786 NW2d 567 (2010), the Court observed that "peer-reviewed, published literature is not always a necessary or sufficient method of meeting the requirements of MRE 702[.]" In that case, "the lack of supporting literature, combined with the lack of any other form of support" for the expert's opinion rendered it unreliable and inadmissible. *Id*. However, in *Edry*, the challenged expert's opinion "was contradicted by both the defendant's oncology expert's opinion *and the published literature on the subject that was admitted into evidence*[.]" *Id*. at 640 (emphasis added). "Moreover," the Supreme Court continued, "no literature was admitted into evidence that supported [the challenged expert's] testimony." *Id*.

Requiring literature when no evidence that such literature exists is an abuse of discretion. "Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point." *Schneider ex rel Estate of Schneider v Fried*, 320 F3d 396, 406 (CA 3, 2003). See also *Dickenson v Cardiac & Thoracic Surgery of Eastern Tenn, PC*, 388 F3d 976, 980 (CA 6, 2004) ("The district court appears to have relied most heavily upon its supposition that a 'purported expert must demonstrate a familiarity with accepted medical literature or published standards in these other areas of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702.' This is an erroneous statement of the law. No authority was cited by the district court in support of its above-quoted statement regarding Rule 702, nor have we found any."). If there is literature describing the forces required to herniate a disc in a patient with spinal stenosis, why didn't the defense produce it? No caselaw supports that imaginary literature may suffice to exclude an otherwise admissible expert opinion.

The circuit court and the majority also gravely err by rejecting the evidentiary importance of the temporal connection between the accident and the emergence of Bernardi's symptoms. Citing *Lowery v Enbridge Energy Ltd Partnership*, 500 Mich 1034; 898 NW2d 906 (2017), the majority scolds that "[c]ourts must remain wary of *post hoc ergo propter hoc* reasoning." Continuing in the same vein and citing *West v Gen Motors* Corp, 469 Mich 177, 186; 665 NW2d 468 (2003), the majority asserts that "showing only a temporal relationship is generally insufficient to establish a causal relationship."

The majority's cut-and-paste approach to jurisprudence elides the facts of *this* case and perverts the role of the "temporal relationship" principle. *Lowery* is a toxic tort case, and *West* presented an employment discrimination claim. Neither involved trauma. The "temporal relationship" rubric served different purposes in those case contexts, as a basic review of the cases reveals.

---

[5] Here, the larger problem is not "interest" in the subject matter, but likely the difficulty in studying the effects of varying levels of trauma in human subjects, especially those with preexisting spinal disease.

In *Lowery*, the plaintiff alleged that exposure to oil fumes caused vomiting which led, weeks later, to the rupture of his gastric artery. *Lowery v Enbridge Energy Ltd Partnership*, unpublished opinion of the Court of Appeals, issued April, 2, 2015 (Docket No. 319199), slip op at 1. The plaintiff's medical expert had not actually examined the plaintiff, and instead relied only on medical records before offering a causation opinion. *Id*. at 1-2. But the records "and the testimony of plaintiff's treating surgeon indicate that plaintiff did not mention oil fumes at the time of treatment." *Id*. at 1. Critically, the plaintiff failed to produce any evidence that his theory of causation was biologically plausible. The *only* evidence he could point to was that the vomiting started after the exposure. The Supreme Court held that slim reed inadequate, and equivalent to conjecture. *Lowery*, 500 Mich 1034.

*Lowery* has no bearing on this case. In *Lowery*, no scientific evidence was presented linking the toxic exposure and the claimed injury. Here, there is no dispute about the fact that trauma can rupture an intervertebral disc. The scientific relationship between trauma and Bernardi's injury is well established—the defense has not claimed otherwise. That symptoms of a disc rupture emerged shortly after the accident provides powerful evidence that the two *are* related, and Dr. Seidel's reliance on temporal proximity as one strand of his medical opinion was neither inappropriate nor scientifically irrational.[6]

In *Heller v Shaw Indus, Inc*, 167 F3d 146, 158 (CA 3, 1999), the Court explained that a "strong temporal relationship" that is part of "a standard differential diagnosis" represents a sufficient methodology under *Daubert*. The Court continued:

> A number of courts, including our own, have looked favorably on medical testimony that relies heavily on a temporal relationship between an illness and a causal event. See, e.g., *Zuchowicz v United States*, 140 F3d 381, 385 (CA 2, 1998); *Kannankeril v Terminix Int'l, Inc*, 128 F3d 802, 809 (CA 3, 1997). The temporal relationship will often be (only) one factor, and how much weight it provides for the overall determination of whether an expert has "good grounds" for his or her conclusion will differ depending on the strength of that relationship. For example, if there was a minor oil spill on the Hudson River on the same day that Heller began experiencing her symptoms in West Chester, Pennsylvania, and she recovered around the time the oil was cleaned up, a proper differential diagnosis and temporal analysis by a well-qualified physician such as Dr. Papano could not possibly lead

---

[6] The majority's unthinking rejection of the importance of the temporal relationship between the trauma and Bernardi's symptoms raises an interesting question. If the timing is irrelevant, the majority's position means that the relationship between the disc rupture and the accident was purely coincidental. A man who had never had a single moment of back pain, had never received treatment or consultation for back pain, suddenly ruptured a disc. That this occurred without any relationship to the undisputed trauma he endured the day before is not only remarkable, but incredible. The defense's insistence that the previous accident may have caused it—an accident involving far less force—only highlights the illogical nature of the majority's "temporal proximity" reasoning.

-10-

to the conclusion that the oil spill caused Heller's illness. . . . *Conversely, "if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened."* [*Id*. at 154 (emphasis added, final citation omitted).]

The majority opinion rests on a fundamentally incorrect premise: that because Dr. Seidel's causation opinion correlates the timing of Bernardi's symptoms with the trauma, it is legally unreliable. No caselaw supports that extreme position. And as my thumb example demonstrates, the majority's view lacks common sense, too.

Dr. Seidel was justified in relying on the temporal relationship between the accident and Bernardi's disc rupture as one element of his differential diagnosis. The circuit court abused its discretion by finding otherwise.[7]

IV

The circuit court cited, and the majority relies on, a plethora of facts which have no bearing on the legal issue at the center of this case: whether the data and methodology underlying Dr. Seidel's opinion testimony were reliable. Before reviewing those facts, it bears mention that MRE 702 appoints the circuit court as a gatekeeper, not a fact finder. The circuit court's gatekeeping role does not extend to resolving disputed fact questions. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v Ford Motor Co*, 215 F3d 713, 718 (CA 7, 2000). When credible, qualified experts disagree, a litigant is entitled to have the jury, not the trial court, decide which expert to believe. *Dorn v Burlington Northern Santa Fe R R Co*, 397 F3d 1183, 1196 (CA 9, 2005).

---

[7] The majority's citation to *West v Gen Motors Corp*, 469 Mich 177; 665 NW2d 468 (2003), as support for its "temporal relationship" holding is similarly thoughtless. In *West* and many other employment cases, direct evidence of discrimination is nonexistent and causation proof depends on the plaintiff's ability to create an inference of causation. Plaintiffs sometimes cite the timing of an adverse employment event as evidence of an illegal motive. But in those cases, too, causation may be properly inferred if an adverse employment action occurs shortly after an employee threatens to report or experiences illegal conduct. *West* itself specifically cites a case in which a "close temporal relationship supported the plaintiff's claim[.]" *West*, 469 Mich at 186. See, e.g., *Love v RE/MAX of America, Inc*, 738 F2d 383, 386 (CA 10, 1984) ("With respect to a causal connection between the protected activity and the adverse employment action, the evidence shows that Liniger fired Love within two hours of receiving her memo containing a raise request and a copy of the Equal Pay Act."). Timing can also work inferentially against a plaintiff. See *Carlton v Mystic Transp, Inc*, 202 F3d 129, 137 (CA 2, 2000) ("Case law teaches that where the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision."). The majority's one-size-fits-all "temporal relationship" reasoning does not apply in employment cases, either.

Part of the *Daubert* inquiry involves an evaluation of whether the data utilized in the expert's methodology is reliable. But this does not mean that a circuit court may pick and choose which underlying—and disputed—*case* facts it chooses to believe. The distinction between disputed case facts and the data underlying an expert's opinion is at the heart of one of the majority's analytical errors.

In the *Daubert* realm, the "data" underlying an expert's opinion generally are derived from studies of a relationship between a toxic exposure and a disease. See, e.g., *Chapin v A & L Parts, Inc*, 274 Mich App 122; 732 NW2d 578 (2007) (involving epidemiological statistics concerning exposure to brake dust and the development of mesothelioma); *Nelson v American Sterilizer Co*, 223 Mich App 485; 566 NW2d 671 (1997) (involving animal studies examining whether low-level, chronic exposure to a chemical used to sterilize heat and moisture sensitive medical equipment can cause liver disease). The numbers and statistics involved in those studies—the "data" in *Daubert* parlance—directly related to the reliability of an expert's opinion. As discussed at length in *Nelson*, animal studies may not relate to human experience with a toxin, or may generate a wide range of results.[8] When exposure to a chemical is alleged to have caused an injury, the proof depends on studies containing data that establish the association, the necessary dose, and the time frame over which exposure is required. Without such data, an expert considering a toxic tort claim would have no reliable basis on which to form an opinion.

The "facts" relied on by the circuit court and the majority to bar Dr. Seidel's testimony bear no relationship to the "facts or data" referred to in MRE 702. For example, the majority spills considerable ink discussing a prior accident in which Bernardi was involved and whether Bernardi was wearing a seat belt at the time of the bus accident, and highlighting Bethea's averment that the accident was a "low-energy transfer event." These *case* facts are not relevant to the question presented under MRE 702, and the majority's discussion of them highlights the majority's misapprehension of the gatekeeping role.[9]

The circuit court found that Bernardi's alleged failure to inform Dr. Seidel of an earlier fender-bender type accident was a factor that rendered Dr. Seidel's opinion inadmissible because

---

[8] In *Nelson v American Sterilizer Co*, 223 Mich App 485, 497; 566 NW2d 671 (1997), this Court held:

> These findings demonstrate, when viewed together, that different species react differently to exposure to EtO, with some species evidencing adverse effects at lower exposure levels than other species. The lack of capacity for the mouse and rat models to predict how even the guinea pig, rabbit, and monkey models would respond to EtO exposure necessarily undercuts confidence that the mouse and rat models will predict accurately how humans will respond to EtO exposure.

[9] The majority's misguided effort to discredit Dr. Seidel's testimony is epitomized by its mention that the CT images were "fuzzy," implying that the images did not actually reveal the herniation. The surgeon who operated on Bernardi noted that the CT scan confirmed a herniated disc at L4-L5, and that he found a ruptured disc during surgery. No evidence supports that the CT scan was misread. Why does its alleged "fuzziness" matter?

it was based on "incomplete information." Bernardi testified that the earlier accident was minor and caused no physical consequences. No evidence contradicted these facts. The prior accident was irrelevant to Dr. Seidel and is irrelevant to this case. The circuit court's claim that Bernardi's failure to share information about a nonevent with Dr. Seidel undercut the reliability of Dr. Seidel's opinion is, for lack of a better word, nonsensical.

The seat belt issue is yet another example of the majority's failure to understand the difference between a fact relevant to an expert's credibility and "fact or data" calling into question the reliability of an expert's opinion. Dr. Seidel admitted that he presumed, incorrectly, that Bernardi had not been belted in at the time of the accident. But he also explained that the "distance translation" that may have contributed to the herniation occurred when Bernardi leaned forward to set the parking brake—a fact that no one contested:

> *Q*. If you were to hear from witnesses that this was an accident that didn't cause much, oiff any, damage to the bus, would that change your opinion?

> *A*. No. Buses are huge. And the vehicles that hit the buses lose and they show the damage, and the buses don't.

> My experience dealing with bus drivers is that they are not restrained. They have a large area in which they operate physically.

> So there may have been a translation of his body over a distance when the accident occurred.

> *Q*. During Mr. Bernardi's deposition, he explained to us that the accident occurred while he was leaning forward and attempting to pull the parking brake of the bus.

> Does that come into your medical analysis in any way?

> *A*. If that was the case, then he had more of a distance translation of the torso versus the lower half of the body.

Dr. Seidel's opinion that the accident caused the herniation was not premised on the incorrect assumption that Bernardi was unbelted. He stated that there "may" have been a "distance translation" if Bernardi was unbelted, and that there was "more" of a distance translation due to Bernardi's act of reaching for the brake when Rock's car struck the bus. The majority unfairly and inaccurately mischaracterizes this testimony as reflecting an opinion that Bernardi was "flung forward or backward due to the impact." Dr. Seidel never said anything of the kind, or even hinted at such a mechanism. His misperception about the seat belt was fodder for cross-examination, not a ground for the exclusion of his testimony. Under MRE 702, a trial court's gatekeeping function focuses on an examination of an expert's methodology. "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v Xtek, Inc*, 689 F3d 802, 805 (CA 7, 2012).

Citing Bethea's estimate of the forces involved in the accident, the majority again misstates the facts and draws a blatantly incorrect conclusion. The majority accurately recounts that the

circuit court offered as one ground for disallowing Dr. Seidel's testimony that Dr. Seidel had inaccurately assumed that the forces involved in the accident were fairly significant. The majority concedes that "[w]hile Dr. Seidel testified that vehicles involved in accidents with buses 'lose and they show the damage,' we agree that *review of the record reveals no assumption on Dr. Seidel's part that a fairly significant force was involved in this accident due to the damage to defendant's Jeep*." (Emphasis added.) Yet four sentences later, citing evidence that Dr. Seidel was aware that Bernardi had been in an accident, the majority states: "All of this suggests that Dr. Seidel believed that significant force was involved in this accident."

Aside from the fact that the majority manages to completely contradict itself in a single paragraph, the majority is wrong. As the majority initially admitted, Dr. Seidel knew perfectly well that this was a low-impact collision. He addressed this issue in his deposition by pointing out that a cough or a sneeze can herniate a disc. He added that an "elderly male with underlying arthritic change" is at increased risk of a traumatic herniation, and that carnival rides exerting low g-forces routinely carry "warnings that say, if anyone has arthritis or problems with their spine, they should not go on those rides. And that's because they get injuries to their spine by going on those rides." The claim that Dr. Seidel overlooked the collision facts or ignored them is utterly disingenuous, yet another reason the circuit court abused its discretion.

Dr. Seidel's testimony rested on a sound and reliable scientific foundation. That some case facts might undercut the believability of that opinion did not render it inadmissible. The circuit court and the majority have displaced the role of the jury searching out and relying on facts irrelevant to a proper inquiry under MRE 702.

V

Finally, the majority has also misconstrued and misapplied basic proximate cause principles. Citing *Skinner v Square D Co*, 445 Mich 153; 516 NW2d 475 (1994), the majority holds that Bernardi's causation proofs are too "speculative" to go to a jury. This case is a far, far cry from *Skinner*.

At the time of his death, the decedent in *Skinner* had been operating an electric metal "tumbling machine" of his own design and manufacture. *Id*. at 157. The plaintiffs theorized that defendant Square D Company defectively designed a switch that the decedent had incorporated in his tumbling machine such that the switch sometimes malfunctioned. *Id*. at 158. Because no one witnessed the decedent's accident, no direct evidence demonstrated any relationship between the switch and the decedent's electrocution. The plaintiffs' case against Square D was entirely circumstantial, predicated on a mere assumption that the Square D switch had played a role in the decedent's death. *Id*. at 163. Some of the physical evidence directly contradicted the hypothetical accident scenario proposed by the plaintiffs. *Id*. at 171-172. Square D maintained that even assuming the presence of a defect in its switch, the plaintiffs' circumstantial proofs failed to demonstrate that the decedent "was misled by the switch when he was fatally electrocuted." *Id*. at 158. The Supreme Court agreed, concluding that the record contained no direct or circumstantial evidence from which a reasonable jury could infer the mechanism of the decedent's electrocution or whether the switch contributed to the accident. The Court emphasized in *Skinner* that "[t]o be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id*. at 164.

-14-

This is not a *Skinner* case by any stretch of the imagination. In *Skinner*, no one saw the accident, and the electrocuted plaintiff could not describe the circumstances surrounding the accident. A defective switch was but one of many possible explanations for what had happened. No such factual vacuums exist in this case. There is no dispute that there was an accident with an impact strong enough to propel a large school bus forward some 10 feet. There is no dispute that Bernardi had no back pain before the accident. There is no dispute that Bernardi woke up the next day in terrible pain. There is no dispute that a herniated disc was discovered shortly thereafter. There is no dispute that trauma can cause a herniated disc. Here, the expert's testimony derives from an established differential diagnosis founded on facts combined with recognized scientific principles, not speculation. *Skinner* is inapposite.

The majority ignores a powerful strand of caselaw that *is* directly applicable to cases such as this. In *Kaminski v Grand Trunk Western R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956), our Supreme Court explained that "if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." (Quotation marks and citation omitted.) More recently, in *Wilkinson v Lee*, 463 Mich 388; 617 NW2d 305 (2000), the Court addressed causation in a factual situation not unlike this one. In *Wilkinson*, as here, the plaintiff's vehicle was struck from behind. *Id*. at 389. The crash was more serious in that case, but the plaintiff's symptoms developed far more slowly. Two years after the accident, the plaintiff was diagnosed with a brain tumor. His physicians testified that the trauma could have precipitated or accelerated the plaintiff's symptoms from the tumor. *Id*. at 390. This Court found evidence of proximate cause lacking, but the Supreme Court reversed. The Supreme Court held, "Regardless of the preexisting condition, recovery is allowed if the trauma caused by the accident triggered symptoms from that condition. The medical testimony at trial would clearly have permitted the jury to conclude that the trauma caused by the accident precipitated the symptoms." *Id*. at 395.

Here as in *Wilkinson*, there was nothing "speculative" about the medical testimony. The Supreme Court observed in *Wilkinson* that the plaintiff's brain tumor "made him more vulnerable to adverse consequences from head trauma than the average person." *Id*. at 397. The Court held that based on the physicians' testimony linking the accident and the symptoms, "the issue of proximate cause was properly submitted to the jury." *Id*. at 398. It is hardly unreasonable or "speculative" to accept that an older man with preexisting spinal disease would be more susceptible to spinal injury, and that even a relatively low-impact collision could set in motion the physiological events precipitating a disc rupture. The evidence created a question of fact regarding the causation of Bernardi's herniated disc. I would reverse the circuit court and remand for trial on the merits.

/s/ Elizabeth L. Gleicher